# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**WALTER REED, on behalf of himself**
**and on behalf of all others similarly situated,**

   **Plaintiff,**

vs.                                                       **Case No. 8:17-cv-199-JDW-CPT**

**CRST VAN EXPEDITED, INC., a foreign**
**for profit company,**

   **Defendant.**

_____/

## ORDER

    **BEFORE THE COURT** is Defendant's Amended Motion for Summary Judgment (Dkt. 125), which Plaintiff opposes (Dkt. 134).Upon consideration, Defendant's motion (Dkt. 125) is **GRANTED.**

    Plaintiff's Fifth Amended Class Action Complaint alleges three violations of the Fair Credit Reporting Act, 15 U.S.C. §1681. (Dkt. 95). Count I alleges Defendant obtained his consumer report for employment purposes without providing notice as required by § 1681b(b)(2)(B)(i). Count II alleges Defendant obtained the consumer report without his consent in violation of §1681b(b)(2)(B)(ii). And Count III alleges Defendant took adverse employment action against him based on the consumer report and failed to provide notice as required by §1681b(b)(3)(B).

## I.    STANDARD

    Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual

1

dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). On the other hand, "[i]f no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." *Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) (quotation omitted).

The moving party bears the initial burden of showing the court, by reference to materials on file, that there "is no genuine issue as to any material fact" that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, "[a]ll the evidence and inferences from the underlying facts must be viewed in the light most favorable to the nonmoving party." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir.1997). When deciding a motion for summary judgment, "[t]he court must avoid weighing conflicting evidence or making credibility determinations." *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir.1993). "It is not part of the court's function to decide issues of material fact, but rather determine whether such issues exist." *Id.*

## II.    DISCUSSION

### A.    Undisputed Facts

Defendant engaged third parties to recruit truck drivers. (Dkt. 98 at 53:23-54:10). It provided verbal training on its processes to the outside recruiters and direct internet links to the "IntelliApp," its online job application. (*Id.* at 66:19-67:25). The IntelliApp included FCRA compliant notice and consent sections. (Dkt. 58 at p. 5-6).[1]

---

[1] As Defendant correctly points out:

FCRA carves out an exemption to the notice and authorization requirements for

2

The outside recruiters' duties include making initial contact with applicants, providing the IntelliApp link to the applicants electronically, and coaching them through completion of the IntelliApp questionnaire. (Dkt. 98 at 88:17-24, 92:3-94:11). When the questionnaire was completed, the IntelliApp was submitted to Defendant. (*Id.*; Dkt. 99 at 38:4-39:5). Defendant reviewed the IntelliApp for completion and automatic disqualifiers, and if none were found, obtained a consumer report on the applicant. (*Id.* at 60:2-61:2; Dkt. 98 at 148:2-16).

In June of 2016, Plaintiff found Trucking Careers of America ("TCA") online and connected with TCA President and owner, James McCormack. (Dkt. 95 ¶ 43; Dkt. 125-1 at 49:1-13). McCormack told Plaintiff that he recruited for several different trucking companies and all of the prospective employers he represented required a background check. (*Id.* at 50:8-51:4, 56:25-57:7). Plaintiff agreed to a background check but expressed concern about whether his criminal history, which included a felony conviction, would automatically disqualify him from employment. (*Id.* at 56:25-57:7, 81:24-82:4). McCormack told Plaintiff that Defendant did not automatically disqualify applicants with felony histories, and the conversation proceeded. (*Id.* at 58:18-59:4).

Plaintiff had only a smartphone, so McCormack read the IntelliApp questionnaire to him over the phone and recorded his responses in the IntelliApp. (*Id.* at 63:23-64:3; Dkt. 48-1 ¶ 4). When the IntelliApp was complete, McCormack electronically signed it with Plaintiff's name and submitted it to Defendant without indicating that he, not Plaintiff, had done so. (*Id.* ¶ 5). This was a deviation from Defendant's procedures for outside recruiters. (Dkt. 99 at 36:23-37:8, 60:1-61:2).

---

companies that employ certain commercial truck drivers who apply for employment via mail, telephone, computer or other similar means. 15 USC § 1681b(b)(2)(B)-(C). For this category of applicant, alone, a prospective employer may provide notice that a consumer report may be obtained for employment purposes via "oral, written, or electronic means" and, similarly, may rely on an applicant's oral, written or electronic consent. 15 U.S.C. § 1681b(3)(B)(C).

(Dkt. 125 at 14). And Plaintiff alleges that this exception applies to him. (Dkt. 95 at ¶¶ 30. 31).

Defendant, unaware that McCormack had signed the application for Plaintiff, reviewed it and obtained Plaintiff's consumer report on June 28, 2016.[2] (*Id.* at 49:10-18).

It is undisputed that Defendant, not McCormack or SRS, obtained Plaintiff's consumer report as part of its background check. And it is undisputed that Plaintiff was informed by McCormack and understood from his telephone conversation with him that a background check would be conducted, and authorized one. (Plaintiff's Decl., ¶ 5; Plaintiff's Depo. 56:25-57:2; 57:1, 3-7; 63:16-64:3).

## B.    Counts I and II

### 1.    Agency

With respect to Counts I and II, Plaintiff argues that the plain language of the FCRA, specifically § 1681b(b)(2)(B)(i) and (ii), requires the same "person" who obtains the consumer report to provide the consumer with notice and obtain consent before doing so. (Dkt. 134 at p. 12). Plaintiff contends that Defendant's outside recruiter policy delegating its FCRA notice and consent obligations to third party agents like McCormack violates the statute. (Dkt. 95 at p. 9). Plaintiff's contention is not persuasive.

Defendant's motion with respect to Counts I and II turns on whether the FCRA permits the delegation of the statutory obligations of notice and consent to third party agents. I find that it does. First, nothing in the statute prohibits the delegation of those statutory obligations to a third party before a consumer report is obtained. Indeed, the statute is silent on that. Notwithstanding, Plaintiff's focus on the word "person" as plain language precluding delegation of those obligations is

---

[2] Plaintiff alleges Defendant obtained a second consumer report on August 10, 2016 without providing notice or obtaining his consent (Dkt. 95 ¶¶ 57, 67), which Defendant denies. (Dkt. 111 ¶¶ 57, 67). This factual dispute is not material to a resolution of Defendant's motion, however, since the analysis of whether Defendant violated the FCRA by delegating its notice and consent obligations to McCormack before obtaining the June consumer report would be the same with respect to the second report.

inconsistent with common law principles of agency and vicarious liability, as well as legislative intent.

In general, common law principles of agency and vicarious liability are read into statutes unless the statute expressly directs otherwise. "[W]hen Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious rules and consequently intends its legislation to incorporate those rules." *Meyer v. Holley*, 537 U.S. 280, 285 (2003), citing *Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709 (1999); *see also United States v. Texas*, 507 U.S. 529, 534 (1993) ("to abrogate a common law principle, the statute must 'speak directly' to the question addressed by common law"). As noted, the FCRA is silent on the use of agents to perform the statutory notice and consent obligations. The FCRA should therefore be read as incorporating common law agency principles.

The FCRA imposes distinct legal obligations "on three types of entities: consumer reporting agencies, users of consumer reports, and furnishers of information to consumer reporting agencies." *See Chipka v. Bank of Am.*, 355 F. App'x 380, 382 (11th Cir. 2009). Defendant, as a user of consumer reports, falls into the second category. While this Circuit has discussed the statutory obligations of these entities, it has not addressed whether the obligations may be delegated to third party agents. *See Chipka*, 355 F. App'x 380; *see also Taylor v. Georgia Power Co.*, 697 F. App'x 630, 631 (11th Cir. 2017).

Circuits that have addressed agency principles in the context of the FCRA have applied the theory of apparent authority with respect to actions of agents of employers. *See, e.g., Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961 (6th Cir. 1998); *Yohay v. City of Alexandria Employees Credit Union, Inc.*, 827 F.2d 967 (4th Cir. 1987). For example, in *Jones*, the Sixth Circuit found that liability under the FCRA may be imposed on an employer for its employees' actions "under a theory

5

of apparent authority." 144 F.3d at 962, 965. The court reasoned that "[t]he FCRA's deterrence goal would be subverted if a corporation could escape liability for a violation that could only occur because the corporation cloaked its agent with the apparent authority to request credit reports." *Id.* at 966. The court concluded that "[b]ecause the application of apparent authority doctrine advances the FCRA's goals and produces no inconsistencies with other FCRA provisions . . . such a theory of liability is an appropriately operative theory of liability under the statute." *Id.*

The Fourth Circuit has likewise found apparent authority applicable in the context of the FCRA. "Behind the principal's liability under an apparent authority theory [ ] is 'business expediency—the desire that third persons should be given reasonable protection in dealing with agents.'" *Yohay*, 827 F.2d at 973 (quoting *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566–67, *reh'g denied*, 458 U.S. 1116 (1982)).

Since apparent authority is available to impose FCRA liability on a principal for the acts of its employees and agents under the reasoning of *Jones* and *Yohay*, it should be available to impose liability on a principal for the acts of its third party agents as well. *See* Restatement (Third) § 7.08(a). It follows, consistent with the common law principles of agency and vicarious liability, that a principal should be able to delegate its FCRA compliance obligations to third party agents. Circuit authority supports this conclusion. I therefore find that Defendant's policy of delegating its statutory obligation to provide notice to a consumer and obtain their consent before obtaining a consumer report does not violate 15 U.S.C. § 1681b(b)(2)(B).

### 2.   McCormack as Defendant's agent

While the determination of whether an agency relationship exists is usually a fact question, it may be determined as a matter of law when there is only one possible outcome. *See Johnson v. Unique Vacations, Inc.*, 498 F. App'x 892, 894, n. 3 (11th Cir. 2012).  Here, that is the case.

An agency relationship exists when a principal confers actual authority on one to act "as [its] representative . . . with power to affect [its] legal rights and duties." Restatement (Third) Of Agency § 1.01 (2006).[3] Actual authority of an agent "is created by a principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the agent take action on the principal's behalf." *Id.* at § 3.01. This may be accomplished "through written or spoken words or other conduct." *Id.* at § 1.03. Accordingly, whether outside recruiters like McCormack had actual authority to fulfill Defendant's FCRA notice and consent compliance obligations depends on their understanding of Defendant's words or conduct.

The record evidence compels only one conclusion, that a reasonable outside recruiter like McCormack understood that Defendant expressly assented to their fulfilling its FCRA notice and consent obligations. First, Defendant provided the IntelliApp, which includes the FCRA notice and consent sections, to the outside recruiters for their use. (Dkt. 58 at p. 5-6). Second, Defendant trained the outside recruiters on the IntelliApp, assigned links to the IntelliApp with unique referral codes, and instructed outside recruiters to guide applicants through the completion and submission of the IntelliApp. (Dkt. 98 at 92:3-94:11).[4] Defendant's manifestations of assent to the outside recruiters would therefore be reasonably interpreted by them as delegating to them the authority to fulfill

---

[3] Common law agency "posits a consensual relationship in which one person, to one degree or another . . . acts as a representative of or otherwise acts on behalf of another person with power to affect the legal rights and duties of the other person." Restatement (Third) Of Agency § 1.01(c) (2006).

[4] The outside recruiters were compensated based on successful job placements, which could only occur after an IntelliApp was complete and accepted. (*Id.* at 66:19-67-25; 78:13-17).

Defendant's statutory obligations. I find, therefore, that McCormack and the other outside recruiters were Defendant's agents for purposes of §1681b(b)(2)(B) compliance.

### 3. Willfulness

Plaintiff seeks statutory and punitive damages under 15 U.S.C. § 1681n(a). (Dkt. 95 ¶¶ 87-88, 101-02; Dkt. 102 ¶ 11). He must therefore demonstrate a willful violation of the FCRA. *Compare* 15 U.S.C. § 1681n(a), *with* 15 U.S.C. § 1681*o*(a). A willful violation may be "knowing" or "reckless." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 56-57 (2007).

Here, there is no evidence that Defendant or its agents knowingly violated the statute. Indeed, there is substantial evidence that Defendant attempted to comply with its notice and consent obligations under the statute by training its internal and outside recruiters in the processes. (*see, e.g.*, Dkt. 98 at 88:17-24, 92:3-94:11, 148:2-16; Dkt 99 at 60:2-61:2). And it is undisputed that an application is not considered complete unless and until the applicant acknowledges: "I confirm that I read the consumer reports, disclosure and authorization documents." (Id. at 66:5-11).

Since there is no evidence of a knowing violation of the statute, *Safeco's* two-step analysis to determine whether a reckless violation occurred applies. *See Safeco*, 551 U.S. at 69. To show recklessness, Plaintiff must demonstrate (1) a violation by Defendant, and (2) conduct demonstrating a risk of violating the law "substantially greater than the risk associated with a reading that was merely careless." *Id.; Levine v. World Fin. Network Nat. Bank*, 554 F.3d 1314, 1318 (11th Cir. 2009) (To prove a reckless violation, a consumer must establish "not only a violation under a reasonable reading of the statute's terms," but also "that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.") (quoting *Safeco* at 69).

8

Plaintiff acknowledges that a company "does not act in a reckless disregard of [the FCRA] unless the action is *not only a violation under a reasonable reading of the statute's terms*, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." (Dkt. 134, p.17) (emphasis added).

As for the first prong of *Safeco's* two part analysis, Plaintiff contends that Defendant's policy of using third party agents to fulfill its statutory obligations violates the statute. (Dkt 134, p.12). As discussed, however, Defendant's policy does not violate the FCRA and was therefore an objectively reasonable reading of the statutory text.[5] A defendant's "reading of the Act that is 'not objectively unreasonable' based on the text of the Act, judicial precedent, or guidance from administrative agencies 'falls well short of raising the unjustifiably high risk of violating the statute necessary for reckless liability.'" *Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1280 (11th Cir. 2017) (citing *Safeco* at 70); *see also Levine v. World Fin. Network Nat. Bank*, 554 F.3d 1314, 1318 (11th Cir. 2009).[6]

It follows that any factual disputes about whether McCormack provided notice or obtained Plaintiff's consent to obtain his consumer report are not material to the question of willfulness. Even

---

[5] I find no support in *Safeco* for Plaintiff's contention that "to take advantage of the "objectively reasonable interpretation" safe harbor, *Safeco requires* that the defendant have "adopt[ed] an acted on an interpretation of the statute." (Dkt. 134 at 17) (emphasis added). Accordingly, his contention that "CRST produced no record evidence it researched whether its process for procuring consumer reports for applicants sourced through outside recruiters complied with § 1681b(b)(2)" is of no moment.

And the deposition testimony of Defendant's corporate representative Plaintiff relies on for his contention that "CRST never bothered to interpret the statute" is somewhat disingenuous, since a fair reading of that testimony demonstrates that legal counsel was involved in the process and training of the outside recruiters.("So I'm aware of an involvement with our legal counsel in building out FCRA trainings that we've performed for our recruiters . . . I'm aware of involvement with out legal counsel . . . I feel like I've answered this when I said our legal counsel is involved in building trainings and reviewing and having meetings with us on these topics . . . . So what I've shared is that our expectation is those outside recruiters are leveraging that link, which complies with the notice and consent requirements. · · In addition, during those trainings that we have over the phone, we discuss our process of running background checks and motor vehicle records with the understanding that those conversations would be had with those applicants over the phone so they have an awareness that reports will be run. ·· But, again, our policies and procedures are to use that link to fill out a CRST employment application.") (Dkt. 98 at 157:14-162:17-164:4-15).

[6] Whether Defendant's conduct followed industry norms or met an accepted standard of care is not part of this analysis. The parties' competing expert reports are therefore immaterial to whether Defendant willfully violated the FCRA.

9

if McCormack was careless or negligent in failing to obtain consent from or provide notice to Plaintiff, his violation would not be the result of Defendant's policy.

Accordingly, Defendant's policy of delegating its statutory notice and consent obligations does not rise to the level of running "a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *See Collins v. Experian Info. Sols., Inc.,* 775 F.3d 1330, 1336 (11th Cir. 2015), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC,* 781 F.3d 1270 (11th Cir. 2015), quoting *Safeco,* 551 U.S. at 69 (affirming summary judgment in favor of credit reporting agency on question of willfulness where its conduct, albeit negligent, "did not rise to the level of running 'a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.'").

Finally, without citing any authority, Plaintiff argues that Defendant's settlement of a lawsuit "containing similar allegations" in 2013 supports a finding of willfulness, since "CRST cannot say it didn't understand the risk for non-compliance was 'substantial.'" (Dkt. 134 at 19). Since delegation of the statutory obligations to third party agents is not a violation of the statute, the settlement of an unrelated case, even if it included similar allegations, does not demonstrate that Defendant acted in reckless disregard for FCRA compliance.

In sum, Plaintiff has not shown that Defendant willfully violated its compliance obligations under 15 U.S.C. § 1681b(b)(2)(B)(i) and 15 U.S.C. § 1681b(b)(2)(B)(ii). Defendant is therefore entitled to summary judgment on Counts I and II.

## C.   COUNT III

In Count III, Plaintiff alleges Defendant used his consumer report in taking adverse employment action against him, failed to provide him with pre-action notice, and failed to provide

him with a copy of the report (Dkt. 95, p. 21). The issue with respect to Count III is whether Plaintiff's dismissal from Defendant's sponsored training program was based, in whole or in part, on his consumer report. *See* 15 U.S.C. § 1681b(b)(3)(B). That section imposes a notification requirement when a potential employer like Defendant "takes adverse action on the employment application based in whole or in part on the [consumer] report."

Plaintiff alleges that he was dismissed from the program based on discrepancies between his application and his consumer report, and argues that his dismissal was therefore based at least in part on his report (Dkt. 95, ¶¶ 62, 63). The undisputed material facts do not support his allegation. Defendant is therefore entitled to summary judgment on Count III because the undisputed material facts demonstrate that Plaintiff was dismissed from the program because he falsified his application by failing to disclose a felony drug conviction, which Defendant verified on the Florida Department of Correction's website. His dismissal was not, therefore, based on a discrepancy between his application and his consumer report, as Plaintiff contends.

Alternatively, even if a jury could infer that his consumer report played some part in his dismissal, Defendant's reliance on the Florida Department of Corrections website to verify his criminal history was objectively reasonable and its actions were therefore not willful.

### 1. The Dismissal

McCormack was correct when he told Plaintiff that Defendant did not automatically disqualify applicants with criminal histories. Defendant reviews each applicant "on a case-by-case basis . . . based on their applications with CRST" (Id. at 15-16; 38:7-21), and utilizes guidelines relating to the criminal histories of its applicants, based on the nature of the offense and number of offenses. (Dkt. 100 at 37:9-10). As Joshua Birr described:

> When we evaluate applicants with a criminal history, we review the
> application, along with their work history, prior violations through
> traffic or criminal, as well as the number of offenses that they've had
> in the past.

(Id. at 38:7-11).

As a condition of employment, Plaintiff completed matriculation paperwork for Defendant's

sponsored driving school (the "J-Tech Form"). In the J-Tech Form, Plaintiff disclosed a 1999 drug

conviction and a misdemeanor that had not been disclosed in his IntelliApp. (Dkt. 125-1 at 75:23-25,

79:1-81:12). This discrepancy was flagged by an employee of Defendant. (Dkt. 48-2, ¶ 3). Birr

compared the IntelliApp with the J-Tech Form and visited the Florida Department of Corrections

website to verify Plaintiff's criminal record. The DOC website verified that Plaintiff had several

criminal convictions, including the subject drug conviction, that had not been disclosed in his

application. Id. Birr concluded that Plaintiff falsified his IntelliApp and recommended his dismissal

from the program:

> I recall that the applicant had filled out a violation sheet admitting to
> a drug offense that wasn't listed on his application, and then that sheet
> was brought to me by Andrea Dennis from the recruiting department
> in the hopes that I could find more information on that criminal
> offense which we didn't have information on, so at that point I
> researched and, through the Florida Department of Corrections
> website, verified that there were additional criminal offenses that the
> applicant failed to disclose on the application, which caused me to
> disqualify him for falsification of the application.

(Dkt. 100 at 55:17-25, 56:1-4).[7]

When discrepancies appear in the information provided by an applicant in an application,

Birr's regular practice was to search the Florida Department of Corrections website, which he did

---

[7] The DOC website revealed prior offenses of grand theft, trafficking in stolen property, burglary, resisting an
officer without violence, cocaine possession, two prior constructive possession offenses and a grand theft of a motor
vehicle, none of which were disclosed on Plaintiff's application. (Id. at 75:15-23).

"two or three times a day.". (Dkt. 100 at 73:13-25, 74:1-5). And that is what he did when the discrepancy between Plaintiff's application and his J-Tech form was brought to his attention. After confirming the discrepancy, Birr acknowledges that he looked at Plaintiff's background report "to see if the drug offense was explained." (Dkt. 100 at 58:21-59:7). It was not. The drug conviction which was not disclosed in the IntelliApp was also missing from the consumer report. (*Id.* at 59:2-7). According to Birr:

> "The applicant had marked yes to question E about, have you ever been convicted for possession, sale or use of a narcotic drug, amphetamine or derivative thereof, which there were no drug offenses listed on the application submitted by the applicant.
> . . .
> At that point I would have looked at his background report to see if the drug offense was explained. . . . I recall looking at it and not finding a drug conviction on there.
> . . .
> At that point I would have researched this violation . . . to try to find out when this offense occurred, which eventually led me to the Department of Corrections, in Florida, website."

(Id. at 55: 22-59: 27, 62: 24-63:1).

The consumer report could not, therefore, resolve Birr's concern that Plaintiff failed to disclose the drug conviction. Indeed, after "looking at" the report, Birr could only conclude "that there was a drug offense listed on the violation sheet that wasn't listed on the application." (Id. at 62:18 - 21). He was only able to resolve that discrepancy after visiting the DOC website and confirming that Plaintiff had indeed failed to disclose the drug conviction. The consumer report therefore played no part in Birr's ultimate recommendation, as it did not explain the undisclosed drug conviction.

Accordingly, contrary to Plaintiff's allegation that he was dismissed from the program based on discrepancies between his application and his consumer report, the undisputed facts show that his

dismissal was based on the discrepancy between his IntelliApp and the J-Tech Form, the non-disclosed drug conviction. (Id. at 77:12-13).

Plaintiff contends that a reasonable juror could find that Birr's recommendation was based, at least in part, on his review of the consumer report, since he admitted to having looked at it before he made the recommendation. Plaintiff relies on the 2013 criminal history in the consumer report, which was also not disclosed in IntelliApp. Plaintiff argues that Birr's testimony that his decision was based solely on the discrepancy between the IntelliApp and the J-Tech Form is a matter of credibility and, therefore, a factual dispute. This argument is not persuasive because the inference he urges is not a reasonable one.

An inference arising from circumstantial evidence must be reasonable. *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1326 (11th Cir. 1982). The reasonableness of an inference is determined by "whether it is one that 'reasonable and fair-minded men in the exercise of impartial judgment' might draw from the evidence." *Id.* (quotation omitted). And while circumstantial evidence may support an inference, "a jury is not permitted to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility." *Id.* And where, as here, direct evidence proves the contrary, the inference is unreasonable. *See Helene Curtis Indus., Inc. v. Pruitt,* 385 F.2d 841, 851 (5th Cir. 1967) ("[A]n inference is unreasonable if it is at war with uncontradicted or unimpeached facts."); *Kuykendall v. United Gas Pipe Line Co.*, 208 F.2d 921, 924 (5th Cir.1954) ("Although the circumstances may support the inference of a fact, if it is shown by direct unimpeached, uncontradicted, and reasonable testimony which is consistent with the circumstances that the fact does not exist, no lawful finding can be made of its existence.")

To begin with, Birr's only concern was the discrepancy between the IntelliApp and the J-Tech Form and whether Plaintiff failed to disclose his drug conviction, an important consideration in employing one as a truck driver. Considering Birr's unimpeached testimony that the consumer report could not explain the discrepancy, the inference Plaintiff urges, that his dismissal was based, at least in part, on his consumer report, is not a reasonable one. The jury would have to speculate that Birr was influenced by the 2013 criminal history, and ignore the direct evidence proving that the report did not explain the discrepancy Birr was concerned about.[8] As discussed, it was only after he verified on the DOC website that Plaintiff had not disclosed the drug conviction that he decided to recommend dismissal. This undisputed, direct evidence therefore disproves the inference Plaintiff urges. As Defendant correctly asserts, "quite plainly, [Defendant] did not take any adverse action based on [Plaintiff's] consumer report." Defendant is therefore entitled to summary judgment on Count III.

**2.    Willfulness**

Alternatively, even assuming that an issue of fact exists with respect to whether the consumer report played some part in Birr's decision, the record evidence does not demonstrate a willful violation.

In Count III, like Counts I and II, Plaintiff seeks statutory and punitive damages. (Dkt. 95 ¶¶ 109-10). Defendant is therefore entitled to summary judgment on Count III if Plaintiff has not demonstrated that Defendant willfully violated 15 U.S.C. § 1681b(b)(3)(B). As discussed, a "willful" violation can be either "knowing" or "reckless." *Safeco*, 551 U.S. at 56-57.

First, there is no evidence that Defendant knowingly violated the statute. To the contrary, Birr's undisputed testimony demonstrates otherwise. Specifically, he testified that "[i]f the disqualification

---

[8] Although the background report included Plaintiff's 2013 criminal history which was not disclosed in his IntelliApp, as well as a 1998 and 2012 history, those entries, according to Birr, amounted only to a single criminal conviction. (Id. at 60:8-25-61:1-62:7) ("He did have one criminal conviction on here, yes.").

is based, in part or fully, on a consumer report, then we are required to follow FCRA procedures . . .
[and] notify the applicant through a pre-adverse-action letter informing them of their rights, and then
at a later date provide them with a post-adverse-action letter." (Dkt. 100 at 45:21-23, 46:1-4). If the
disqualified applicant is in orientation, Birr emails the pre-adverse-action letter and a copy of the
applicant's consumer report to the trainers, who print them and provide them to the applicant. (Id. at
46:22-26, 47:1-2). And if the disqualified applicant is in the driver training school, the recruiting
department follows the FCRA procedure. (Id. at 48:22-25, 49:1-2).

Moreover, Defendant produced its adverse action notification practices, which include training
materials, scripts, and form letters to consumers, all of which were thoroughly examined and discussed
during the deposition of Defendant's Rule 30(b)(6) representative, Jennifer Abernathy. (*See* Dkt. 98
at 101:14-131:25). Plaintiff does not dispute the adequacy of those adverse action notification practices
or materials. *See id.* And it is apparent from Abernathy's deposition that the failure to provide Plaintiff
with the adverse notification is the premise for the FCRA violation alleged in Count III.

> Q: Is the company aware as to whether any of these notifications–and
> I'm talking about the script for adverse-action notification and the
> adverse-action letter, and I'm specifically documenting Bate-stamped
> 102– were ever provided to Walter Reed, the plaintiff in this case?
>
> A: (Witness complies.) These were not provided to Walter Reed,
> because it was not his consumer reports used. [sic]

(Dkt. 98 at 131:17-25).

Considering this evidence, there could not have been a knowing violation of the FCRA as a
matter of law. Accordingly, *Safeco's* two-step analysis for determining whether a "reckless" violation
occurred applies. *See Safeco*, 551 U.S. at 69. As noted, Plaintiff must demonstrate (1) a violation, and

16

(2) conduct demonstrating a risk of violating the law "substantially greater than the risk associated with a reading that was merely careless." *Id.*

The analysis therefore returns to Birr's decision to recommend dismissal. Birr's undisputed testimony is that "there was falsification of the application" based on the discrepancy between Plaintiff's application and the DOC website (Dkt. 100 at 78:3-7), and not between the application and his consumer report. (Id. at 78:8-25). Even if a reasonable inference could be drawn that the report played some part in Birr's decision because of the 2013 criminal history in it, the undisputed evidence does not support a finding that Defendant's conduct was reckless.

Based on Birr's unimpeached testimony explaining his reason for recommending dismissal, and Alexander's explanation for why pre-action notification was not provided, Defendant's interpretation of whether the FCRA pre-action notification under § 1681b(b)(3)(B) was required was not objectively unreasonable and does not demonstrate a risk of violating the law "substantially greater than the risk associated with a reading that was merely careless." And, as Defendant contends, Birr's reliance on the DOC website to verify Plaintiff's criminal history and determine whether his application was falsified was objectively reasonable. *See Alexander v. Sonny's Real Pit Bar-B-Q*, No. 3:16-CV-117-J-20JRK, 2016 WL 9488722, at *4 (M.D. Fla. July 20, 2016), *aff'd*, 701 F. App'x 931, 937 n. 5 (11th Cir. 2017).[9]

In sum, Plaintiff provides no authority or evidence that Defendant's conduct was "objectively unreasonable based on the text of the Act, judicial precedent, or guidance from administrative agencies." *Pedro*, 868 F.3d at 1280. Plaintiff has therefore not shown Defendant willfully violated 15 U.S.C. § 1681b(b)(3)(B), and Defendant is entitled to summary judgment on Count III.

---

[9] As for Plaintiff's argument that *Alexander* is distinguishable (*see* Dkt. 134, pp. 16-17), the salient point in *Alexander* is that "procuring an individual's criminal background information through public records is nonactionable under any provision of 15 U.S.C. § 1681." *Id.*

## IV.   CONCLUSION

Summary judgment is appropriate where, as here, "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Plaintiff, as the nonmoving party "may not rest upon the mere allegations" in its pleadings. *Walker v. Darby,* 911 F.2d 1573, 1576-77 (11th Cir. 1990). Although Plaintiff has a theory of FCRA violations, the law is not in his favor on Counts I and II, and the undisputed material facts demonstrate that he cannot prevail on Count III.

Accordingly, Defendant's Amended Motion for Summary Judgment (Dkt. 125) is **GRANTED**. The Clerk is directed to enter judgment in favor of Defendant, CRST Van Expedited, Inc. and against Plaintiff, Walter Reed.

All pending motions are **DENIED** *as moot*. The Clerk is instructed to **CLOSE** the file.

**DONE AND ORDERED** this ___*16*th___ day of August, 2018.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to: Counsel of Record

18